United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NETFLIX, INC.,

           Plaintiff,

    v.

ROVI CORPORATION, et al.,

           Defendants.

Case No. 11-cv-6591 PJH

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

      Plaintiff's motion for summary judgment came on for hearing before this court on March 25, 2015.  Plaintiff (and counter-defendants) Netflix, Inc. ("plaintiff" or "Netflix") appeared through its counsel, Ashok Ramani, Tina Sessions, Ed Bayley, Michael Kwun, and Sharif Jacob.  Defendants (and counter-claimants) Rovi Corporation, Rovi Technologies Corporation, Rovi Guides, Inc., United Video Properties, Aptiv Digital Inc., and Starsight Telecast, Inc. (referred to collectively as "defendants" or "Rovi") appeared through their counsel, Yar Chaikovsky, Hong Lin, and Amol Parikh.  Having read the papers filed in conjunction with the motion and carefully considered the arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiff's motion as follows.

**BACKGROUND**

      This is a patent case.  Plaintiff Netflix originally filed a declaratory judgment action against defendants, seeking declaratory judgments of non-infringement and invalidity of five Rovi patents.  Rovi then filed counterclaims asserting infringement of those five patents, as well as three additional patents (for a total of eight patents).  Netflix then

1   answered Rovi's counterclaims with additional declaratory judgment counterclaims, for

2   non-infringement and invalidity of the three newly-asserted patents.

3        Three of the patents have since dropped out of the suit, leaving five remaining

4   patents, all of which are at issue on this motion:  (1) U.S. Patent No. 6,898,762 ("the '762

5   patent"); (2) No. 7,065,709 ("the '709 patent"); (3) No. 7,103,906 ("the '906 patent"); (4)

6   No. 7,945,929 ("the '929 patent"); and (5) No. 7,974,962 ("the '962 patent").  Four of

7   these patents (the '762, '709, '929, and '962 patents) are related to interactive program

8   guides, while the fifth (the '906 patent) is related to creating bookmarks for resuming

9   playback across different devices.

10       For ease of reference in this order, the court will sometimes refer to the '762 and

11  the '709 patents as the "Viewing History patents," as they relate to storing a user's

12  viewing history and making recommendations based on that history; and will refer to the

13  '929 and the '962 patents as the "Category patents," as they relate to the use of

14  categories to organize programs.  The court will refer to the '906 patent as the

15  "Bookmarking patent."

16       Netflix's original complaint was filed on December 21, 2011.  In May 2012, the

17  court stayed the case pending the outcome of an International Trade Commission ("ITC")

18  investigation.  In July 2014, after the ITC proceedings had concluded, the parties

19  stipulated to lift the stay, and agreed to a schedule for claim construction.  Netflix then

20  filed this motion for summary judgment under § 101, intending for it to be heard before

21  claim construction, but the court consolidated the two hearings.  Having recently issued a

22  claim construction order, the court now turns to Netflix's motion for summary judgment.

23                                        **DISCUSSION**

24  A.   Legal Standards

25       1.   Motions for Summary Judgment

26       A party may move for summary judgment on a "claim or defense" or "part of . . . a

27  claim or defense."  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when there

28  is no genuine dispute as to any material fact and the moving party is entitled to judgment

United States District Court
Northern District of California

1   as a matter of law.  Id.

2        A party seeking summary judgment bears the initial burden of informing the court

3   of the basis for its motion, and of identifying those portions of the pleadings and discovery

4   responses that demonstrate the absence of a genuine issue of material fact.  Celotex

5   Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Material facts are those that might affect the

6   outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A

7   dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable

8   jury to return a verdict for the nonmoving party.  Id.

9        Where the moving party will have the burden of proof at trial, it must affirmatively

10  demonstrate that no reasonable trier of fact could find other than for the moving party.

11  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  On an issue

12  where the nonmoving party will bear the burden of proof at trial, the moving party may

13  carry its initial burden of production by submitting admissible "evidence negating an

14  essential element of the nonmoving party's case," or by showing, "after suitable

15  discovery," that the "nonmoving party does not have enough evidence of an essential

16  element of its claim or defense to carry its ultimate burden of persuasion at trial."  Nissan

17  Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000);

18  see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to

19  the district court that there is an absence of evidence to support the nonmoving party's

20  case).

21       When the moving party has carried its burden, the nonmoving party must respond

22  with specific facts, supported by admissible evidence, showing a genuine issue for trial.

23  Fed. R. Civ. P. 56(c), (e).  But allegedly disputed facts must be material – the existence

24  of only "some alleged factual dispute between the parties will not defeat an otherwise

25  properly supported motion for summary judgment."  Anderson, 477 U.S. at 247-48.

26       When deciding a summary judgment motion, a court must view the evidence in the

27  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

28  Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

United States District Court
Northern District of California

3

United States District Court
Northern District of California

2.      Invalidity under Section 101

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101.  The Supreme Court has found an important implicit exception to the boundaries of patentability, holding that "laws of nature, natural phenomena, and abstract ideas are not patentable." Diamond v. Diehr, 450 U.S. 175, 185 (1981).

The line between an unpatentable abstract idea and a patentable invention has not always been a bright one, especially with regard to process patents (also called method patents).  Courts have adopted various tests to delineate the boundaries of patentability, and in recent years, the tests have been revisited.  The recent line of cases began in 1998, when the Federal Circuit held that a process could be patentable as long as it produced a "useful, concrete, and tangible result." State Street Bank & Trust Co. v. Signature Financial Group, Inc., 149 F.3d 1368, 1373 (Fed. Cir. 1998).

The "useful, concrete, and tangible result" test persisted until 2008, when an en banc panel of the Federal Circuit rejected it, and instead held that a "claimed process is surely patent-eligible under § 101 if:  (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." In re Bilski, 545 F.3d 943, 954 (Fed. Cir. 2008).  The Federal Circuit further held that this "machine-or-transformation" test was "the sole test governing § 101 analyses." Id. at 955.

The Bilski case then reached the Supreme Court, which took a different view of the "machine-or-transformation" test.  Rather than being the "sole test governing § 101 analyses," the Court held that the test was merely an "important and useful clue" regarding patentability. Bilski v. Kappos, 561 U.S. 593, 603 (2010).  Instead of focusing exclusively on the machine-or-transformation test, the Bilski Court looked more broadly at whether the patent-in-suit, covering a method for buyers and sellers of commodities to hedge against the risk of price fluctuations, was an attempt to claim an abstract idea.

4

1    The <u>Bilski</u> Court ultimately determined that the patent covered "the basic concept

2    of hedging, or protecting against risk," which was an "unpatentable abstract idea," and in

3    fact, was a "fundamental economic practice long prevalent in our system of commerce

4    and taught in any introductory finance class."  561 U.S. at 611.  To find the patent valid

5    would "pre-empt the use of this approach in all fields, and would effectively grant a

6    monopoly over an abstract idea."  <u>Id.</u> at 612.  The Court then made clear that "limiting an

7    abstract idea to one field of use or adding token postsolution components" would not turn

8    an unpatentable abstract idea into a patentable method, noting that certain of the patent's

9    claims "attempt to patent the use of the abstract idea of hedging risk in the energy

10   market" (as opposed to all markets) or "instruct the user of well-known random analysis

11   techniques to help establish some of the inputs into the equation," neither of which was

12   sufficient to make the invention patentable.  <u>Id.</u>

13   Two years later, in <u>Mayo Collaborative Services v. Prometheus Laboratories, Inc.</u>,

14   the Court shed further light on the boundaries of patentability under § 101.  132 S.Ct.

15   1289 (2012).  In <u>Mayo</u>, the Court was faced with patents on a process for helping doctors

16   determine whether drug dosages for patients with autoimmune diseases were too low or

17   too high.  The key question before the Court was whether the claims covered an

18   unpatentable law of nature (analogous to the <u>Bilski</u> Court's consideration of whether the

19   claims covered an unpatentable abstract idea).

20   <u>Mayo</u> cited previous Supreme Court precedent warning against "upholding patents

21   that claim processes that too broadly preempt the use of a natural law," and "insisting that

22   a process that focuses upon the use of a natural law also contain other elements or a

23   combination of elements, sometimes referred to as an 'inventive concept,' sufficient to

24   ensure that the patent in practice amounts to significantly more than a patent upon the

25   natural law itself."  132 S.Ct. at 1294 (internal citations omitted).  In essence, the Court

26   asked this question:  besides the natural law itself, "[w]hat else is there in the claims

27   before us?"  <u>Id.</u> at 1297.  In answering that question, the <u>Mayo</u> Court found that "the

28   claims inform a relevant audience about certain laws of nature; any additional steps

1   consist of well-understood, routine, conventional activity already engaged in by the

2   scientific community; and those steps, when viewed as a whole, add nothing significant

3   beyond the sum of their parts taken separately."  Id. at 1298.

4          The Mayo Court emphasized that the refusal to allow patents on laws of nature

5   arose out of a "concern that patent law not inhibit further discovery by improperly tying up

6   the future use of laws of nature."  132 S.Ct. at 1301.  While "rewarding with patents those

7   who discover new laws of nature and the like might well encourage their discovery, those

8   laws and principles, considered generally, are the basic tools of scientific and

9   technological work," and allowing patents that "tie up their use will inhibit future innovation

10  premised upon them, a danger that becomes acute when a patented process amounts to

11  no more than an instruction to 'apply the natural law.'"  Id.

12         Most recently, in Alice Corp. Pty. Ltd. v. CLS Bank International, the Court made

13  clear that the two-step approach set forth in Mayo applied not only to patents relating to

14  natural laws, but also to patents relating to abstract ideas.  Alice, 134 S.Ct. 2347 (2014).

15  The Alice Court described Mayo as setting forth "a framework for distinguishing patents

16  that claim laws of nature, natural phenomena, and abstract ideas from those that claim

17  patent-eligible applications of those concepts," and described the framework as follows:

18  "First, we determine whether the claims at issue are directed to one of those patent-

19  ineligible concepts.  If so, we then ask 'what else is there in the claims before us?'"  Alice,

20  134 S.Ct. at 2355 (internal citations omitted).  The Alice Court then explained that "[w]e

21  have described step two of this analysis as the search for an 'inventive concept' – i.e., an

22  element or combination of elements that is sufficient to ensure that the patent in practice

23  amounts to significantly more than a patent upon the ineligible concept itself."  Id.

24  (internal citations omitted).

25         The Alice Court then applied that two-part test to the patents before it, which

26  covered a computerized method for mitigating "settlement risk," described as "the risk

27  that only one party to an agreed-upon financial exchange will satisfy its obligation."

28  Specifically, the claimed processes were designed to "facilitate the exchange of financial

United States District Court
Northern District of California

6

obligations between two parties by using a computer system as a third-party intermediary."  The computer system would track each party's ability to satisfy its financial obligations, and would ultimately use that data to provide instructions to each party for carrying out the proposed transactions, thus mitigating the risk that only one party would perform the agreed-upon exchange.

On the first step of the <u>Mayo</u> test, the <u>Alice</u> Court found that the patents were directed to the idea of intermediated settlement, which was an abstract idea.  Thus, the Court moved to the second step of the test, and asked whether the claims contained an "inventive concept" that was "sufficient to transform the claimed abstract idea into a patent-eligible application."

The <u>Alice</u> Court ultimately concluded that the patents' claims did not contain such an "inventive concept," and while the opinion did not describe the type of disclosures that <u>would</u> be sufficient to constitute an inventive concept, it did give clear examples of the types of disclosures that were <u>not</u> sufficient.

First, <u>Alice</u> followed the <u>Mayo</u> Court in holding that "[s]tating an abstract idea while adding the words 'apply it' is not enough for patent eligibility."  134 S.Ct. at 2358 (internal citation and quotations omitted).  Also insufficient is "limiting the use of an abstract idea to a particular technological environment."  <u>Id.</u>

Combining those two principles, the <u>Alice</u> Court held that "stating an abstract idea while adding the words 'apply it with a computer' simply combines those two steps, with the same deficient result."  134 S.Ct. at 2358.  Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."  <u>Id.</u>  The Court noted that such a conclusion "accords with the preemption concern that undergirds our § 101 jurisprudence."  <u>Id.</u>  In other words, simply adding a "wholly generic computer implementation" did not meaningfully limit the scope of a patent, and in practice, would lead to the same result as patenting an abstract idea itself.

In reaching its conclusion, the <u>Alice</u> Court demonstrated the shortcomings of the "machine-or-transformation" test.  While a computer (even a generic one) is undoubtedly

7

1    a "machine," its inclusion in a patent claim cannot be sufficient for § 101 purposes, as it

2    would allow an applicant to "claim any principle of the physical or social sciences by

3    reciting a computer system configured to implement the relevant concept," thereby

4    "eviscerating the rule that laws of nature, natural phenomena, and abstract ideas are not

5    patentable."  134 S.Ct. at 2359 (internal citations omitted).

6          In a similar vein, the <u>Alice</u> Court held that the inclusion of "well-understood,

7    routine, conventional activities previously known to the industry" did not suffice as the

8    "inventive concept" necessary for patentability.  Just as the addition of a generic

9    computer to an abstract idea would not place meaningful limits on a patent's scope, the

10   addition of generic computer functions would similarly fail to provide any such limits.

11         In sum, the <u>Alice</u> Court found that the "claims at issue amount to nothing

12   significantly more than an instruction to apply the abstract idea of intermediated

13   settlement using some unspecified, generic computer."  134 S.Ct. at 2360.  Under

14   previous precedent, "that is not '<u>enough</u>' to transform an abstract idea into a patent-

15   eligible invention."  <u>Id.</u> (emphasis in original).

16         By clarifying that the addition of a generic computer was not enough for § 101

17   patentability, <u>Alice</u> has had a significant impact on software patents.  In <u>Alice</u>'s wake, the

18   Federal Circuit and numerous district courts have wrestled with the issue of whether

19   various software patents disclose the "inventive concept" required for patentability.

20   Having reviewed the cases cited in the parties' papers, the court finds two post-<u>Alice</u>

21   Federal Circuit cases particularly useful for discerning the boundaries between a software

22   patent that merely discloses an unpatentable abstract idea and one that discloses a

23   patentable invention.

24         The first of these cases, <u>Ultramercial, Inc. v. Hulu, LLC</u>, involved a patent covering

25   a method for monetizing and distributing copyrighted products over the Internet.  772

26   F.3d 709 (Fed. Cir. 2014).  Specifically, the claimed method allowed a user to view

27   copyrighted media (such as a television show) over the Internet, for no charge, in

28   exchange for viewing an advertisement.

8

United States District Court
Northern District of California

1    The <u>Ultramercial</u> patentee maintained that its patent covered a "specific method of

2  advertising and content distribution that was previously unknown and never employed on

3  the Internet before," and thus was not the type of "well-known" and "routine" activity

4  rejected in <u>Alice</u>.  772 F.3d at 714.  The patentee further argued that its claimed invention

5  "extends beyond generic computer implementation of [an] abstract idea."  <u>Id.</u>  In support

6  of its argument, the patentee pointed to the detailed eleven-step process disclosed in the

7  patent:

> (1) receiving the copyrighted media from a content provider, (2) selecting an
> ad, (3) offering the media on the Internet, (4) restricting public access to the
> media, (5) offering the media to the customer in exchange for watching the
> selected ad, (6) receiving a request to view the ad from a user, (7)
> facilitating display of the ad, (8) allowing the consumer to access the media,
> (9) allowing the consumer access to the media if the ad is interactive, (10)
> updating the activity log, and (11) receiving payment from the ad sponsor.

12  <u>Id.</u> at 714-15.

13    The <u>Ultramercial</u> court agreed that these steps added "a degree of particularity,"

14  but ultimately found that they still described "only the abstract idea of showing an

15  advertisement before delivering free content."  772 F.3d at 715.  Thus, under the first step

16  of <u>Alice</u>, the patent was indeed directed towards an abstract idea.

17    The <u>Ultramercial</u> court then asked whether the claims "did significantly more than

18  simply describe that abstract method," i.e., whether the claims disclosed an "inventive

19  concept."  It cited <u>Alice</u> and <u>Mayo</u>'s teaching that a claim that "recites an abstract idea

20  must include additional features to ensure that the claim is more than a drafting effort

21  designed to monopolize the abstract idea," and that the "additional features" must be

22  "more than well-understood, routine, conventional activity."  772 F.3d at 715 (internal

23  citations omitted).

24    Applying those teachings, the <u>Ultramercial</u> court found the patent invalid, as "the

25  claims simply instruct the practitioner to implement the abstract idea with routine,

26  conventional activity."  772 F.3d at 715.  Regardless of whether the eleven recited steps

27  were viewed individually or as a whole, they did not "transform the nature of the claim into

28  patent-eligible subject matter."  Instead, the "claims' sequence of steps comprises only

1   conventional steps, specified at a high level of generality, which is insufficient to supply

2   an inventive concept." Id. at 716.  While the court acknowledged that "some of the

3   eleven steps were not previously employed in this art," it held that was "not enough –

4   standing alone – to confer patent eligibility."  Id.

5       In the second Federal Circuit case, DDR Holdings, LLC v. Hotels.com, L.P., the

6   court upheld the patentabilty of a software patent under Alice.  773 F.3d 1245 (Fed. Cir.

7   2014).  The DDR patent sought to solve a problem that arose when website visitors

8   clicked on an advertisement on a "host website."  The user would be automatically

9   transported away from the host website and taken to the advertiser's website, which

10   meant that the host website lost that website visitor, and that the user's experience was

11   disrupted, making them less likely to purchase a product from the advertiser.  The patent

12   disclosed a method for generating a "hybrid website" – which replicated the "look and

13   feel" of the host website, but contained the relevant product information for the

14   advertiser's website, and even enabled the web user to purchase products from the

15   advertiser without needing to visit the advertiser's website.

16       The DDR court did not expressly state that it found that the patent was directed to

17   an abstract idea (though the opinion suggests as much).  Regardless, DDR moved to

18   step two of the Alice analysis, and found that there was an inventive concept, as the

19   claims "do not attempt to preempt every application of the idea of increasing sales by

20   making two web pages look the same," and instead recited a "specific way to automate

21   the creation of a composite web page."  773 F.3d at 1259.  The DDR court expressly

22   distinguished Ultramercial, holding that the DDR patent's claims were "different enough

23   from those in Ultramercial because they do not broadly and generically claim 'use of the

24   Internet' to perform an abstract business practice (with insignificant added activity)."  Id.

25   at 1258.  Instead, by disclosing a "specific way" to create composite web pages, the

26   patent constituted "more than a drafting effort designed to monopolize the abstract idea,"

27   and thus, contained the required "inventive concept" required for patentability under

28   § 101.  Id. at 1259 (citing Alice, 134 S.Ct. at 2357).

10

What stands out from the <u>Alice</u>/<u>Mayo</u> line of cases is the courts' focus on preemption as the key concern underlying section § 101 analyses. This theme of preemption runs throughout <u>Alice</u> and <u>Mayo</u>, and is especially apparent when viewing <u>Ultramercial</u> and <u>DDR</u> together. Notably, though the courts in both <u>Ultramercial</u> and <u>DDR</u> appear to have concluded that the patents at issue were directed towards abstract ideas, the <u>DDR</u> court found that the patent disclosed an "inventive concept," whereas the <u>Ultramercial</u> court found otherwise. In so finding, the <u>DDR</u> court did not focus on the novelty of the disclosed invention, but instead hinged its ruling on the fact that the claims did "not attempt to preempt every application of the idea," and instead covered only one "specific way to automate the creation of a composite web page." 773 F.3d at 1259. In contrast, the patent at issue in <u>Ultramercial</u> appeared to be a "drafting effort designed to monopolize the abstract idea itself." 772 F.3d at 716.

In other words, the hallmark of the "inventive concept" test is whether the patentee has added something to the claims to limit their scope, so that they do not monopolize the entire abstract idea to which the claims are directed. This accords with the purpose of section 101's carve-outs for abstract ideas, laws of nature, and physical phenomena, which is to "ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." <u>Alice</u>, 134 S.Ct. at 2355. In articulating the "inventive concept" requirement, the <u>Mayo</u> Court heeded prior Court cases which "warn us against upholding patents that claim processes that too broadly preempt the use of" an ineligible concept, such as an abstract idea. <u>Mayo</u>, 132 S.Ct. at 1294. In that sense, the search for an "inventive concept" can also be thought of as a search for a "limiting concept" – something that restricts the scope of the claims, ensuring that the patent does not cover the entirety of the abstract idea.

This understanding of an "inventive concept" as akin to a "limiting concept" is in line with the courts' rejection of the patents at issue in <u>Mayo</u> and <u>Alice</u>. In <u>Mayo</u>, the Court held that the addition of "well-understood, routine, conventional activity already engaged in by the scientific community" did not serve to provide the required "inventive

1   concept." 132 S.Ct. at 1298.  In other words, by disclosing only run-of-the-mill steps, the

2   claims did not meaningfully restrict the scope of the patent.  Similarly, in <u>Alice</u>, the Court

3   held that merely stating an abstract idea and adding the words "apply it with a computer"

4   did not suffice as an "inventive concept," because a "wholly generic computer

5   implementation is not generally the sort of 'additional feature' that provides any practical

6   assurance that the process is more than a drafting effort designed to monopolize the

7   abstract idea itself." 134 S.Ct. at 2358.  If the <u>Alice</u> patentee had added something more

8   to the claims, beyond the mere use of a computer, to ensure that the claims covered a

9   specific application of the abstract idea (rather than the idea itself), it could have been

10  patent-eligible under § 101.

11      Notably, the search for an "inventive concept" places no importance on the novelty

12  of the abstract idea.  A novel abstract idea is still an abstract idea, and is therefore

13  unpatentable.  Just as "Einstein could not patent his celebrated law that $E=mc^2$," despite

14  it being a new discovery, an inventor cannot patent any new abstract idea that he

15  discovers.  <u>See</u> <u>Diamond</u>, 450 U.S. at 185, 190 ("The question therefore of whether a

16  particular invention is novel is wholly apart from whether the invention falls into a

17  category of statutory subject matter.").

18      Thus, at the second step of the <u>Alice</u>/<u>Mayo</u> test, after a court has determined that

19  the patent is directed towards an abstract idea, the key question is whether the claims

20  add something to the abstract idea so that the patent covers a specific application of the

21  abstract idea, rather than the idea itself.  <u>See, e.g.</u>, <u>Accenture Global Services, GmbH v.</u>

22  <u>Guidewire Software, Inc.</u>, 728 F.3d 1336, 1341 (Fed. Cir. 2013) (if a patent is directed at

23  an abstract idea, the court must then "determine whether additional substantive

24  limitations narrow, confine, or otherwise tie down the claim so that, in practical terms, it

25  does not cover the full abstract idea itself.").  This understanding of the second

26  <u>Alice</u>/<u>Mayo</u> step is reflected in the <u>DDR</u> decision, which upheld a patented process only

27  after finding that "the claims at issue do not attempt to preempt every application of the

28  idea" embodied in the patents, and instead were limited to "a specific way" of

1   accomplishing the general concept.  DDR, 773 F.3d at 1259.

2          Of the district court cases decided post-Alice, the discussion of the "inventive

3   concept" in Caltech v. Hughes Communications is particularly helpful.  59 F.Supp.3d 974

4   (C.D. Cal. 2014).  Caltech is also one of the few post-Alice cases to uphold the validity of

5   a software patent, making it especially useful for discerning the boundaries of § 101.

6          Caltech involved patents covering processes for the encoding and decoding of

7   data for error correction.  At the first Alice/Mayo step, the court found that the patents

8   were indeed directed to an abstract idea.  The court then observed that, if the patent

9   sought to claim those essential concepts, without any limiting principle, it would "threaten

10  to preempt the entire field of error correction."  59 F.Supp.3d at 993.  Thus, as part of the

11  second Alice step, the Caltech court sought to determine whether the claims "contain

12  meaningful limitations that represent sufficiently inventive concepts."  Id. at 994.

13         Ultimately, the Caltech court did find an inventive concept, noting that the patents

14  contained steps that were not "necessary or obvious tools for achieving error correction,"

15  and thus "ensure that the claims do not preempt the field of error correction."  59

16  F.Supp.3d at 994.  By disclosing "unconventional" techniques for error correction that

17  were "narrowly defined," "tied to a specific error correction process," and "not necessary

18  or obvious tools for achieving error correction," the patents did not preempt the field of

19  error correction, as any conventional, well-understood, and routine methods of error

20  correction remained outside of the patents' boundaries.  Id. at 994-996.

21         The determination of whether an asserted claim is invalid for lack of subject matter

22  patentability under § 101 is a question of law.  See In re Comiskey, 554 F.3d 967, 975

23  (Fed. Cir. 2009).  A patent is presumed to be valid by statute, 35 U.S.C. § 282; therefore,

24  a patent challenger bears the burden of proving invalidity by clear and convincing

25  evidence.  See Pfizer, Inc. v. Apotex, Inc., 480 F.3d 1348, 1359 (Fed. Cir. 2007).  This

26  standard of proof applies equally at summary judgment.  See National Presto Indus. v.

27  West Bend Co., 76 F.3d 1185, 1189 (Fed. Cir. 1996).

28

United States District Court
Northern District of California

13

B.      Legal Analysis

With the above principles in mind, the court must now apply the two-part Alice/Mayo test to the five patents at issue in this suit.  As mentioned above, the court finds it helpful to consider the patents as part of three different groups:  the Category patents, the Viewing History patents, and the Bookmarking patent.  The court will address each group in turn.

1.      Category patents ('929 patent and '962 patent)

a.      '929 patent

The '929 patent covers the use of "combination categories" to organize various programs – in other words, instead of using only "simple" categories such as "comedy" or "drama" to classify movies, this patent covers categorizing programs using "combination categories," such as "sports dramas," or "romantic comedies," or even "critically-acclaimed foreign animated movies featuring strong female leads and set in the 1950s."

In its motion, Netflix cites claim 11 as representative of the '929 patent, and Rovi's brief primarily discusses claim 11 and claim 14.  Claim 11 reads as follows:

A system for locating programs of interest to a user, the system comprising:

a receiver that receives a plurality of program listings, wherein at least one of the program listings is associated with two or more simple categories; and

a processor that generates at least one combination category by:

identifying the two or more simple categories associated with the at least one program listing; and

combining at least a subset of the identified simple categories associated with the at least one program listing into the at least one combination category, wherein the combination category comprises more than one of the identified simple categories.

Claim 14 is dependent on claim 13, which is dependent on claim 12, which is in turn dependent on claim 11.  Claims 12, 13, and 14 read as follows:

12.   The system of claim 11, wherein the processor is configured to combine at least a subset of the identified simple categories associated with

14

the at least one program listing into the at least one combination category by:

      combining the identified simple categories into groups of two or more of the identified simple categories; and

      determining, for each of the groups of simple categories, whether the respective group is contained within a list of supported categories;

      wherein the at least one combination category comprises one of the groups of simple categories contained within the list of supported categories.

13.  The system of claim 12, wherein the processor is further configured to:

      automatically identify a plurality of simple categories that are of high interest to the user; and

      generate the list of supported categories from the plurality of simple categories that are of high interest to the user.

14.  The system of claim 13, wherein the processor is configured to automatically identify a plurality of simple categories that are of high interest to the user by identifying a first simple category that received more user selections than a second simple category.

Addressing the first <u>Alice</u>/<u>Mayo</u> step, Netflix describes these claims as being directed to the abstract idea of "categorizing shows using combination categories," and Rovi does not meaningfully challenge this assertion in its opposition, instead arguing that the use of combination categories was unknown in the prior art at the time.  <u>See</u> Dkt. 121 at 22 (describing the '929 patent's "critical aspect" as "generating 'combination categories' from program listings associated with simple categories, a problem <u>which the prior art 17 years ago had not solved</u>.") (emphasis in original).  Rovi further argues that the novelty of combination categories makes the '929 patent "fundamentally different from the abstract, longstanding business practice" at issue in <u>Alice</u>.  Dkt. 121 at 23.

However, the issue of whether combination categories were known in the prior art does not say anything about whether the claims are directed to an abstract idea – and it seems apparent that the idea of using composite categories to define shows is indeed abstract, even if it was wholly novel at the time of filing.  The fact that dependent claims

United States District Court
Northern District of California

1    13 and 14 add the element of generating recommendations using those combination

2    categories does not render the claims any less abstract.

3        Thus, the court moves to step two of the <u>Alice</u>/<u>Mayo</u> test, and asks whether the

4    '929 patent discloses an inventive concept.  Rovi analogizes this case to <u>Caltech</u>, in

5    which the court found that the patent disclosed "a unique computing solution that

6    addresses a unique computing problem."  However, Rovi seems to ignore that the

7    <u>Caltech</u> court focused on the narrow nature of the claimed solution in finding it patentable

8    – emphasizing that the claims contained "meaningful limitations," "ensur[ing] that the

9    claims do not preempt the field of error correction."  <u>Caltech</u>, 59 F.Supp.3d at 994.

10       Here, the court is unable to find any such "meaningful limitations."  Rovi cites

11   testimony from its expert stating that claim 11 recites the following "unconventional

12   steps," which purportedly distinguish this case from <u>Alice</u> and <u>Ultramercial</u>:

13       (1) generating at least one combination category by:  identifying the two or
14       more simple categories associated with the at least one program listing, (2)
         combining at least a subset of the identified simple categories associated
15       with the at least one program listing into the at least one combination
         category, and (3) wherein the combination category comprises more than
16       one of the identified simple categories.

17   Dkt. 121 at 24 (citing Dkt. 121-4, ¶ 83).

18       The court fails to see how these so-called "unconventional" steps – whether

19   considered individually or as part of an ordered combination – are anything more than re-

20   stating the abstract idea with the instruction to "apply it."  Rovi fails to show how its

21   claimed method would be different from a "conventional" method of using combination

22   categories, and instead proceeds on the assumption that offering expert testimony

23   invoking the word "unconventional" is enough.  Essentially, Rovi seeks to patent the idea

24   of using combination categories, limited only by the use of a "processor" and a "receiver,"

25   both of which are generic computer components of the type rejected in <u>Alice</u>.

26       In its opposition, Rovi takes issue with Netflix's identification of claim 11 as

27   representative, and argues that other dependent claims contain inventive concepts:

28       For example, claim 12 requires "supported categories," claim 13 requires "a

plurality of simple categories that are of high interest to the user," claim 14 requires a "first simple category that received more user selections than a second simple category," claim 16 requires "associated metadata," claim 17 requires a combination category assigned to a "program listing," [and] claims 18, 19, and 20 require specific hardware integral to the claimed method, like presenting the categories "on the display."

Dkt. 121 at 24.

While these dependent claims may indeed contain additional elements, Rovi has not shown how any of those elements provide meaningful limitations on the abstract idea of using combination categories. At best, claims 18, 19, and 20 require a type of machine, but a "display" is even more generic than the "general purpose computer" rejected in Alice.

The '929 patent may well disclose an idea that was unconventional at the time of the patent's filing. However, an unconventional abstract idea is still an unpatentable abstract idea. Rovi must do more than merely show an unconventional idea, it must show an unconventional embodiment of that idea. Otherwise, the patent would preempt all embodiments of the abstract idea – precisely the result that the Alice/Mayo test was designed to safeguard against. In other words, whereas the DDR court found that "the claims at issue do not attempt to preempt every application of the idea" at issue, this court finds that the '929 patent would indeed preempt every application of the idea of using combination categories to categorize programs. As a result, the court finds that the '929 patent fails to disclose an inventive concept, and is thus invalid under § 101.

   b. '962 patent

The '962 patent covers the use of "selectable categories" to allow users to filter their search results when searching for television shows. In other words, rather than just searching for shows by title, users may also use categories to refine their search results. Both parties primarily cite claim 1 as a representative example:[1]

---

[1] In a footnote, Rovi takes issue with the identification of claim 1 as representative, arguing that "each asserted claim requires distinctive features of the claimed search engine application. Dkt. 121 at 19, n. 15. For example, Rovi cites the "on-demand programming" requirement of claims 3 and 16; the "titles of shows" requirement of claims

A method for searching for shows comprising:

providing a search engine application;

receiving one or more characters in said search engine application, wherein said one or more characters are entered in an alpha-numeric input area;

matching said characters using said search engine application to one or more database entries;

providing results corresponding to said database entries in a results listing, wherein said results comprise one or more show listings and one or more selectable categories of shows;

receiving a user selection from said results listing of one of said selectable categories;

providing at least one additional show listing corresponding to said selected selectable category in response to the user selection of said selected selectable category; and

enabling a user to perform an action by selecting one of said at least one additional show listings.

Netflix argues that the '962 patent is directed to an abstract idea, and again, Rovi does not meaningfully challenge this argument.  In fact, Rovi admits that "the claimed steps are directed to the critical feature of enabling users to refine their searches based on selectable categories."  Dkt. 121 at 19.  While Rovi argues that this "critical feature . . . differ[s] in a fundamental respect from the abstract methods of using a computer merely to calculate a pre-computer age mathematical problem," and instead "recites a technological solution to a problem of refining user searches that arose in the realm of

5 and 18; the requirement of selection of characters from entries in an alphanumeric input area of claims 6 and 19; the "keyword search field" requirement of claims 9 and 23; the structural requirements of claim 14, including an "input device," an "output device," a "display of results listings," and a "display of additional show listing;" and claim 27's requirement of a "computer readable medium . . . having computer readable program code" of claim 27.  These claims are substantially similar to claim 1, with the additional elements of note being the structures disclosed in claims 14 and 27.  However, the disclosed "input device," "output device," "display[s]," and "computer readable medium" are no more particular than the "general purpose computer" that was rejected in Alice.

18

1   interactive program guides," those arguments, at best, establish the novelty of the

2   abstract idea.  Overall, the court finds that the '962 patent is indeed directed to the

3   abstract idea of filtering search results using selectable categories.

4       Thus, the court moves to the second Alice/Mayo step, and asks whether the '962

5   patent discloses an inventive concept.  Rovi first argues that its own proposed

6   construction ties the "search engine application" to "hardware, software, and/or firmware

7   which receives search requests and interfaces with one or more databases to respond to

8   search requests."

9       It appears that Rovi is trying to establish patentability according to the pre-Alice

10  (and pre-Bilski) "machine or transformation test," whereby claims were held to be patent-

11  eligible if they were tied to a particular machine or apparatus (or if they transformed a

12  particular article into something different).  However, as discussed above, the Supreme

13  Court's Bilski decision held that the "machine or transformation" test was not the definitive

14  test for patentability.  561 U.S. at 603.  Thus, even if the '962 patent were tied to a

15  particular machine, that still would not render the claims patentable.  Moreover, the court

16  has not adopted Rovi's proposed construction, so there is no "machine" disclosed in

17  claim 1, and the only "machines" disclosed in the other claims ( the "input device," "output

18  device," and "display[s]" of claim 14, and the "computer readable medium" of claim 27)

19  are no more particular than the "general purpose computer" that was rejected in Alice.[2]

20      Rovi then tries another argument, arguing that the computer-implemented steps

21  do not operate in a normal, expected manner in the following ways:  (1) providing search

22  results that comprise show listings and selectable categories, (2) providing at least one

23  additional show corresponding to each selectable category, (3) enabling a user to select

24  shows, (4) enabling a user to watch selected shows, and (5) enabling a user to obtain

25  additional information about the shows.  See Dkt. 121 at 21.  This recitation of steps

26

27  _____

28  [2] Further, even if the court had adopted Rovi's proposed construction, "hardware,
    software, and/or firmware" is even broader than the "general purpose computer" rejected
    in Alice.

strikes the court as similar to that in <u>Ultramercial</u>, where the patentee pointed to its eleven-step process as proof that the claims disclosed "a specific method of advertising and content distribution that was previously unknown and never employed on the Internet before." 772 F.3d at 714.  The <u>Ultramercial</u> court rejected that argument, first finding that "each of those eleven steps merely instructs the practitioner to implement the abstract idea with routine, conventional activities," and then concluding that although "some of the eleven steps were not previously employed in this art," that was "not enough – standing alone – to confer patent eligibility upon the claims at issue." <u>Id.</u> at 716.

The court finds that the rationale of <u>Ultramercial</u> applies here with equal force. Rovi's five-step process represents no more than an instruction to "implement the abstract idea" of using selectable categories to filter search results with "routine, conventional activity."  While the steps add a level of detail, they constitute no more than simply re-stating the abstract idea with the instruction to "apply it."  Whether considered as individual steps or as an ordered combination, the court finds no inventive concept that would prevent Rovi's patent from preempting the entire abstract idea of using selectable categories to filter search results.

Finally, Rovi argues that the claims "transform characters into selectable categories."  Specifically, Rovi argues that the claims disclose the transformation of alpha-numeric categories into "results comprising one or more show listings and one or more selectable categories of shows."  This argument appears to imply that any patent which involves using text to represent any sort of selectable object (a video file, an audio file, a web hyperlink, etc.) involves a "transformation" that brings the patents within § 101's boundaries.

Whereas Rovi had previously argued under the "machine" prong of the "machine or transformation" test, it now argues under the "transformation" prong.  For support, Rovi relies on a district court case where the invention disclosed the use of a "tag" that was appended to credit card data as part of a verification process.  <u>Card Verification Solutions, LLC v. Citigroup, Inc.</u>, 2014 WL 4922524 (N.D. Ill. Sept. 29, 2014).  Even

1   putting aside the fact that <u>Card Verification</u> is a district court case, and not binding on this

2   court, there are at least two points of distinction that undercut the opinion's persuasive

3   value.

4         First, <u>Card Verification</u> was decided on a motion to dismiss, and the court simply

5   left open the question of whether the claims were patentable under § 101.  Second, the

6   <u>Card Verification</u> court acknowledged that "typically, transforming data from one form to

7   another does not qualify as the kind of transformation regarded as an important indicator

8   of patent eligibility," but found that the invention went beyond "manipulating, reorganizing,

9   or collecting data by actually adding a new subset of numbers or characters to the data,

10  thereby fundamentally altering the original confidential information."  2014 WL 4922524,

11  at *5.

12        In contrast, this case involves the mere "reorganization" of data using categories,

13  there is no "fundamental alteration" to the information itself.  Moreover, the <u>Card</u>

14  <u>Verification</u> invention did not cover all credit card verification systems, and instead was

15  limited to applications that involved appending a "tag."  This finding echoes <u>Caltech</u>,

16  where the court specifically found that the claimed method "does not capture many

17  forms" of implementing the abstract idea of error correction, and thus, the claims did "not

18  preempt the field of error correction but capture[d] only one effective form of error

19  correction."  59 F.Supp.3d at 996.  In contrast, the '962 patent contains no such limiting

20  principle, and the claims seek to capture all uses of selectable categories to filter search

21  results.

22        Accordingly, the court finds that the '962 patent fails to disclose an inventive

23  concept, and thus is invalid under § 101.

24        2.      Viewing History patents ('762 patent and '709 patent)

25              a.      '762 patent

26        The '762 patent claims a system and method for visually distinguishing watched

27  programs from unwatched programs and making viewing recommendations based on a

28

United States District Court
Northern District of California

user's viewing history.  The parties use claim 1 and claim 13 as illustrative examples:[3]

> 1.  A method for use in a client-server interactive television program guide system for tracking a user's viewing history, comprising:

>> tracking a user's viewing history;

>> storing the user's viewing history on a program guide server;

>> finding programs with the program guide server that are consistent with the user's viewing history;

>> determining, with the program guide server, whether the programs found by the program guide server were not previously viewed on user television equipment; and

>> displaying, with a program guide client implemented on the user television equipment, a display of program titles, wherein the display:

>>> includes the programs found by the program guide server, wherein some of the programs have been previously viewed on the user television equipment and some of the programs have not been previously viewed on the user television equipment; and

>>> visually distinguishes the programs determined by the program guide server to have been previously viewed from the programs that have not been previously viewed.

> 13.  A client-server interactive television program guide system for tracking a user's viewing history, comprising:

>> user television equipment on which an interactive television program guide client is implemented, wherein the interactive television program guide client is programmed to provide an individual user's viewing history information to a program guide server over a communications path, wherein:

>> the program guide server is programmed to find programs based on the individual user's viewing history information, determine whether

---

[3] In a footnote, Rovi argues that claim 1 is not representative of the '762 patent, and argues that the other claims "recite distinctive applications of the claimed client-server architecture."  Dkt. 121 at 12, n. 13.  Rovi points to the step of "collecting program ratings information" of claims 6 and 17; the "user preference information" of claim 15; and the "additional physical structure" of claim 13, which includes "user television equipment" and a "communications path."  These claims are substantially similar to claim 1, and to the extent that claim 13 includes additional physical structures, a "communications path" is no more particular than the "general purpose computer" that was rejected in Alice, and "user television equipment" is fully addressed above.

the programs found by the program guide server have been previously viewed on user television equipment, and to indicate the programs to the interactive television program guide client over the communications path; and

the interactive television program guide client is further programmed to display, on the user television equipment, a display of program titles, wherein the display:

includes the programs found by the program guide server, wherein some of the programs have been previously viewed on the user television equipment and some of the programs have not been previously viewed on the user television equipment; and

visually distinguishes the programs determined by the program guide server to have been previously viewed from the programs that have not been previously viewed.

Netflix argues that this patent is directed to an abstract idea, while Rovi argues that the patent is limited to a "unique program guide-program server architecture integral to the claimed invention."  Rovi also emphasizes the fact that the ITC found that the '762 patent (and the '709 patent, which shares the same specification) does not embody an abstract idea.  However, the ITC decision was issued before Alice, and even putting that aside, the decision contains no analysis that the court finds persuasive, and instead just contains a rote recitation that the patents cover more than just abstract ideas.  Also, even if the claims were limited to a specific architecture, such a limitation would factor into the second step of Alice, not the first step.  Overall, the court does find that the '762 patent is directed to the abstract idea of using a user's viewing history to visually distinguish watched programs from unwatched programs and to make recommendations.

On the second step of Alice, Rovi again argues that the claims are tied to a particular machine.  Interestingly, while the claims do appear to be limited to "user television equipment," Rovi does not emphasize that limitation.  Instead, in its opposition, Rovi offers the conclusory assertion that the program guide server/client are "unique and particular," without explaining how a "program guide server/client" system is any different from a generic server/client system that happens to be used for displaying program guides.  A generic system component does not become any less generic through the

1   addition of a functional description.  As an example, if the claims in <u>Alice</u> had referred to a

2   "settlement risk-mitigating computer," rather than just a generic computer, it would not

3   make the computer any more "unique" or "particular."

4       However, while the terms "program guide server" and "program guide client" do

5   not limit the claims to anything more particular than a general purpose computer, the term

6   "user television equipment" presents a distinct question.  Interestingly, Rovi's brief does

7   not discuss the "user television equipment" limitation in any detail, and simply cites to the

8   ITC's conclusion that "[u]ser television equipment implementing a program guide client is

9   a 'particular machine' integral to the client-server system of the '762 patent."  Dkt. 121 at

10  13 (citing ITC record at ID 129).  Because the ITC decision does not present the

11  reasoning behind its conclusion, the court does not consider it particularly persuasive,

12  and rather than relying on the ITC's conclusion, the court will address the issue anew.

13      Essentially, the question before the court is whether "user television equipment" is

14  closer to the "general purpose computer" of <u>Alice</u> (which was held not to be sufficiently

15  "particular" for § 101 purposes) or closer to the GPS receiver of <u>SiRF Tech., Inc. v. Int'l</u>

16  <u>Trade Commission</u> (which was held to be sufficiently "particular" for § 101 purposes).

17  <u>See Alice</u>, 134 S.Ct. at 2358; <u>SiRF</u>, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010).  Although

18  <u>SiRF</u> was decided before both <u>Alice</u> and <u>Mayo</u>, and thus does not address the two-part

19  test, the court still finds <u>SiRF</u> somewhat relevant in light of the Supreme Court's holding

20  that the "machine or transformation" test can be a "useful and important clue" regarding

21  patentability.

22      As mentioned above, Rovi's brief does not present any argument equating "user

23  television equipment" to <u>SiRF</u>'s GPS receiver.  As a result, at the hearing, the court

24  asked both parties for further argument on the issue.  Rovi offered only the conclusory

25  assertion that the claims are "very much like the GPS receiver in <u>SiRF</u>" because "the

26  systems wouldn't function without the GPS receiver in <u>SiRF</u>" and, similarly, the system

27  here "wouldn't function without the server and client [and] the user television equipment

28  that exists in the '762 patent."  Dkt. 151 at 93.  However, it cannot be enough to simply

United States District Court
Northern District of California

show that the system "would not function" without the particular machine.  If it were, then

the <u>Alice</u> Court would have upheld the patents in that case, because the claimed method

would not have functioned without the cited general purpose computer.  <u>SiRF</u>, to the

extent it remains good law in light of <u>Alice</u>, requires more than just a showing that the

claimed method "would not function" without a recited machine.

In <u>SiRF</u>, the court held that "[i]n order for the addition of a machine to impose a

meaningful limit on the scope of a claim, it must play a significant part in permitting the

claimed method to be performed, rather than function solely as an obvious mechanism

for permitting a solution to be achieved more quickly."  601 F.3d at 1333.  The court also

emphasized that "there is no evidence here that the calculations here can be performed

entirely in the human mind," and thus, "the use of a GPS receiver is essential to the

operation of the claimed methods."  <u>Id.</u>

In the present case, the human mind is certainly capable of distinguishing between

watched and unwatched programs, and making recommendations based on a user's

viewing history.  The use of television equipment simply enables those steps to be

visually represented, and at best, is "an obvious mechanism for permitting a solution to

be achieved more quickly."  In fact, if the user has watched only a few programs, the use

of television equipment rather than the human mind may be no quicker at all.  Overall, the

court finds that "user television equipment" is not analogous to the GPS receiver of <u>SiRF</u>,

and thus, is not sufficiently limiting for purposes of section 101.

Beyond the "particular machine" argument, Rovi separately argues that the claims

"do not operate in a normal, expected manner," as they include the non-generic steps of:

(1) determining on the server whether the programs have been previously viewed, (2)

sending a signal to the client indicating the previously-viewed programs, and (3) visually

distinguishing the previously-watched programs.  <u>See</u> Dkt. 121 at 13-14 (citing Dkt. 121-

1, ¶ 103).  The court fails to see how these steps – whether considered individually or as

an ordered combination – are anything other than the type of routine, conventional, well-

understood steps that were rejected in <u>Alice</u>, <u>Mayo</u>, and <u>Ultramercial</u>.  Thus, the court

1   finds that the '762 patent fails to disclose an inventive concept that adds something to the

2   claims other than the abstract idea itself, and thus, is invalid under § 101.

3             b.      '709 patent

4        The '709 patent, which shares a common specification with the '762 patent, claims

5   a system and method for providing personal recommendations based on a user's viewing

6   history.  The parties use claims 13 and 14 as illustrative examples:

7
8        13.  A method for use in an interactive program guide system for providing
        a customized viewing experience to a user, comprising:

9
10           generating a viewing history database comprising program listings
             and associated program criteria;

11           determining at least one of the associated program criteria from the
             viewing history database that meets a user preference profile;

12           determining from a program listing database a set of programs not
13           yet watched;

14           applying the at least one of the associated program criteria to the set
             of programs not yet watched to generate at least one personal
15           viewing recommendation; and

16           providing the personal viewing recommendation to a user.

17        14.  The method defined in claim 13 wherein generating a viewing history
        database comprises storing the program listings and the associated
18        program criteria for at least one of:

19           programs that the user has watched;

20           programs for which the user has scheduled reminders;

21           programs for which the user has scheduled for recording;

22           programs for which the user has searched; and

23           programs for which the user has ordered.

24        Netflix argues that the claims are directed to an abstract idea, and Rovi argues

25   that the concept was novel at the time, as the patent "recited a technological solution to a

26   specific problem arising in interactive television guides of generating personal viewing

27   recommendations based on programs not yet watched regardless of which device the

28   user employs."  Again, while Rovi may be correct that the claims are directed to a <u>novel</u>

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    abstract idea, they nonetheless are directed to an abstract idea, namely, the abstract

2    idea of generating viewing recommendations.

3         Rovi argues that the claims are tied to particular machines, but unlike the '762

4    patent, there is not even a limitation to "television equipment" here, only a "viewing

5    history database" and a "program listing database."[4]  A "database" is no different from a

6    generic computer, and as before, the addition of functional descriptors does not turn a

7    generic database into something more particular.  While the ITC concluded that the

8    "database in the interactive program guide system is a particular type of machine," given

9    the intervening Alice opinion, the court finds the ITC's conclusion of limited value.

10   Accordingly, the court finds that the '709 patent claims fail to tie the method to a particular

11   machine that would sufficiently limit to the scope of the patent to something narrower

12   than an abstract idea.

13        Rovi then argues that the claimed steps "do not operate in a normal, expected

14   manner," and cites to expert testimony stating that the step of "determining at least one of

15   the associated program criteria from the viewing history database that meets a user

16   preference profile" is not a routine or conventional activity for a computer database.  Dkt.

17   121 at 17 (citing Dkt. 121-1, ¶ 126).  Rovi also cites to a district court case from the

18   District of Delaware, where "tailoring the delivery of information to a specific user" was

19   found patentable under Alice.  Intellectual Ventures v. Traders Trust, 2014 WL 7215193

20   (D. Del. 2014).

21        In Intellectual Ventures, the patents were based on the idea of "providing a

22   customized web page with content based on the user's profile and website navigation

23

24   _____

     [4] Rovi also cites, in a footnote, other claims that purportedly recite "distinctive applications
25   of the program guide-program server architecture to generate personal viewing
     recommendations."  See Dkt. 121 at 16, n. 14.  These purported "distinctive applications"
26   are substantially similar to the methods of claims 13 and 14, with the additional elements
     of note being the "additional physical structure" in claim 17.  However, the disclosed "user
27   equipment on which an interactive program guide client is implemented," "program guide
     server," "first database," "second database," "processing circuitry," and "communications
28   path" are no more particular than the "general purpose computer" that was rejected in
     Alice.

United States District Court
Northern District of California

1  history." 2014 WL 7215193 at *9. The court followed the Federal Circuit's decision in

2  DDR (mentioned above) and found the invention patentable, but specifically pointed out

3  that the claims "do not preempt all applications of providing customized web pages, as

4  they recite a specific method of customizing web pages based on user data." Id.

5       In contrast to Intellectual Ventures, the '709 patent in this case does not disclose a

6  "specific method" of generating viewing recommendations, as the claims seek to capture

7  virtually all methods of generating recommendations. Neither the claims themselves nor

8  Rovi's brief contain any meaningful disclosure of how the recommendations are

9  generated – based on what programs viewers with similar preferences have liked, or

10  based on the content providers' own determination of what programs are similar, etc. In

11  short, unlike Intellectual Ventures, and unlike Caltech, these claims do seek to preempt

12  all applications of the abstract idea. Moreover, the court finds that the claimed steps –

13  whether considered individually or as part of an ordered combination – do not go beyond

14  routine, conventional means of generating viewing recommendations. Thus, the court

15  finds that no inventive concept is disclosed, and that the '709 patent is invalid under

16  § 101.

17       3.     Bookmarking patent (the '906 patent)

18       The '906 patent claims a method of creating a "bookmark" to allow users to start

19  watching a program on one device, then resume the program at the same point on a

20  different type of device. Rovi's brief primarily cites claims 1 and 6 as illustrative of the

21  claims.[5] Claim 1 reads as follows:

22       A method for providing configurable access to media in a media-on-demand
23       system comprising the steps of:

24

25  [5] In a footnote, Rovi cites other claims that purportedly "recite[] distinctive applications" of
the claimed method. Rovi points to the step of "identifying device properties . . . prior to
commencing delivery of the media" in claim 2; the requirement of storing the media and
26  delivering it to one or a plurality of media-on-demand servers in claims 3, 6, and 8; and
the step of "interrupting said delivery of said media" in claims 10 and 11. Dkt. 121 at 7,
27  n. 9. The court finds these claims to be substantially similar to claims 1 and 6, and linked
to the same abstract idea.

28

United States District Court
Northern District of California

delivering the media to a first client device through a first communications link, wherein the media is configured in a format compatible with identified device properties of said first client device and said first client device is associated with a first user;

recording a bookmark specifying a position in the media; and

delivering the media to a second client device through a second communications link, said delivery to said second client device beginning at said position specified by said recorded bookmark, wherein the media is configured in a format compatible with identified device properties of said second client device and said second client device also is associated with said first user.

Claim 6 is dependent on claim 3, which is dependent on claim 2, which is in turn dependent on claim 1. Claims 2, 3, and 6 read as follows:

2. The method according to claim 1, further comprising the steps of:

identifying device properties for each of said first and second client devices, device properties of said first client device being identified prior to commencing delivery of the media to said first client device and device properties of said second client device being identified prior to commencing delivery of the media to said second client device.

3. The method according to claim 2, wherein the media is stored in a media-on-demand server (MODS) and delivered to said first and said second client devices via said first and said second communications link respectively.

6. The method according claim 3, further comprising:

storing the media in selected ones of a plurality of media-on-demand servers, each MODS in said plurality of media-on-demand servers storing the media in at least one format compatible with a selected device type;

selecting a MODS for delivering the media to said first client device, said selected MODS having stored thereon the media in a format compatible with said first client device; and

delivering from said selected MODS the media in a format compatible with said first client device.

Netflix argues that the '906 patent claims are directed to the abstract idea of bookmarking across devices, while Rovi focuses on the fact that the process was novel

United States District Court
Northern District of California

1   at the time of invention.  As discussed above, whether the process was novel does not

2   factor in the "abstract" analysis.  A novel abstract idea is still an abstract idea.

3           When discussing the '906 patent at the hearing, the court specifically asked Rovi's

4   counsel: "What makes it not abstract?"  Dkt. 151 at 64.  Counsel responded by pointing to

5   the "media-on-demand server system" and the "client-server architecture," but as the

6   Alice Court held, the mere presence of a computer does not preclude a finding that the

7   patent is directed to an abstract idea.  Just as the Alice Court found that the claims were

8   directed to "the abstract idea of intermediated settlement," despite the presence of a

9   computer, the court finds that the '906 patent claims are directed to the abstract idea of

10  bookmarking media files across devices, despite the presence of a server and a client.

11          Moving to the second step's search for an inventive concept, Rovi's primary

12  arguments are based on the machine or transformation test – arguing both that the

13  claims are limited to particular machines, and that the addition of a bookmark effects a

14  transformation of the media file.  First, regarding the "machine" argument, Rovi points to

15  two claim limitations – the use of a "media-on-demand system," and the use of "client

16  devices."

17          As an initial matter, the court finds that a "client device" is no more particular than

18  a generic "general purpose computer," and thus must be rejected as a "particular

19  machine" for the same reason articulated by the Alice Court.  However, the analysis for

20  the "media-on-demand system" (also referred to as a "media-on-demand server" in the

21  parties' papers) presents a distinct question.

22          The "particular machine" analysis with respect to the "media-on-demand system"

23  is similar to the one above, in the context of the '762 patent's disclosure of "user

24  television equipment."  And as above, the key question for the court is whether the

25  disclosed "media-on-demand system" is more similar to the "generic computer" of Alice or

26  the GPS receiver of SiRF.

27          Netflix argues that, in practice, a media-on-demand server is no different from a

28  generic server, and thus, should be rejected for the same reason that the Alice Court

30

1   rejected a general purpose computer as enough to establish patentability.  Rovi responds

2   by arguing that SiRF directly applies, as the '906 patent discloses machines that "play a

3   significant part in permitting the claimed method to be performed."  601 F.3d at 1332-33.

4   Rovi argues that the "media-on-demand system" – made up of a "media-on-demand

5   server," a "first client device," and a "second client device" – "provide[] users with the

6   ability to receive delivered media (such as a movie) across a network in a client device

7   through a communications link to a media-on-demand server."  Rovi's expert opines that

8   "without the [media-on-demand server], the media could not be configured in a format

9   compatible with identified device properties of the first and second client devices and

10  delivered in those different formats to the first and second client devices."  Dkt. 121 at 8.

11  Rovi further argues that the media-on-demand server is necessary for recording a

12  specified position in the media, and for pausing and resuming media across different

13  devices with different formats.  Dkt. 121 at 8-9.

14         While SiRF may remain good law even in light of Alice, it seems apparent that a

15  machine must do more than simply "play a significant part in permitting the claimed

16  method to be performed" in order to supply the required inventive concept.  Given Alice's

17  rejection of a "general purpose computer" as sufficient to establish patentability, a

18  patentee must show that the machine itself is a particular machine, and not just that a

19  generic machine is being used for a particular purpose.  As discussed above, if

20  identifying a particular function of a machine were enough to establish patentability under

21  the "machine or transformation" test, then any patentee could evade invalidity by using

22  specific-sounding language to describe a general purpose computer.  For instance, the

23  Alice patentee could describe the recited general purpose computer as a "settlement risk-

24  mitigating computer," without which the claimed method could not be performed.  To

25  allow a patentee's creative description of his claimed computer to govern patent eligibility

26  would be to turn the § 101 analysis into a draftman's art.  Such an approach directly

27  contradicts the purpose underlying § 101.

28         In this case, the court has no basis on which to find that the recited "media-on-

United States District Court
Northern District of California

United States District Court
Northern District of California

1    demand system" is anything other than a generic server/client system, nor that the

2    "media-on-demand server" is anything other than a generic server.  Simply adding the

3    term "media-on-demand" does not make a generic computer component any more

4    particular.

5         Aside from the "machine" argument, Rovi separately argues that the

6    "bookmarking" step "transforms the media file," and thus "meaningfully limits the '906

7    patent claims."  For support, Rovi relies on the above-mentioned <u>Card Verification</u> case,

8    a post-<u>Alice</u> district court case involving a credit card verification method in which a "tag"

9    was appended to the credit card information.  <u>Card Verification</u>, 2014 WL 4922524.

10        After first finding that the patent was directed to the abstract idea of verifying credit

11   card information, the <u>Card Verification</u> court then applied the second <u>Alice</u>/<u>Mayo</u> step,

12   ultimately concluding that the "claims may be sufficiently limited by the transformation

13   that occurs when the randomly-generated tag is added to the confidential information."

14   2014 WL 4922524 at *5.  Although the court noted that "typically, transforming data from

15   one form to another does not qualify as the kind of transformation regarded as an

16   important indicator of patent eligibility," it nonetheless found that "the claimed invention

17   goes beyond manipulating, reorganizing, or collecting data by actually adding a new

18   subset of numbers or characters to the data, thereby fundamentally altering the original

19   confidential information."  <u>Id.</u>

20        While the court finds that Rovi's "transformation" argument is stronger than its

21   "machine" argument, there are still several problems with it.  First, and most simply, as

22   mentioned above, the <u>Card Verification</u> court had before it a motion to dismiss rather than

23   a motion for summary judgment, and was thus "bound to make all reasonable inferences"

24   in favor of the patentee.  2014 WL 4922524 at *4.  Specifically, the court considered the

25   question of whether the claimed process might be one that "can be performed by a

26   human mind with nothing more than pen and paper," but because such a question was a

27   "factual question inappropriate at the motion to dismiss stage," it denied the motion to

28   dismiss.  Because the present case involves a motion for summary judgment with the

1  benefit of a full record of discovery, this court is in a different position than was the Card

2  Verification court.

3      Second, also as mentioned above, while the Card Verification court did find

4  sufficient possibility of a "transformation," it cited a Federal Circuit case for the proposition

5  that "the mere manipulation or reorganization of data . . . does not satisfy the

6  transformation prong."  Card Verification, 2014 WL 4922524 at *5 (citing CyberSource

7  Corp. v. Retail Decisions, Inc., 654 F.3d 1366, 1375 (Fed. Cir. 2011)).  CyberSource

8  involved a computerized process for detecting credit card fraud by creating a "map" of

9  credit card numbers and the IP addresses from which those cards were used to complete

10  transactions.  The court agreed that the process "manipulates data to organize it in a

11  logical way such that additional fraud tests may be performed," but ultimately held that

12  the "mere manipulation or reorganization of data, however, does not satisfy the

13  transformation prong."  654 F.3d at 1375.

14      To determine whether to apply CyberSource or Card Verification, the court must

15  decide whether the addition of a bookmark constitutes mere "manipulation" or

16  "reorganization" of data, or whether it "fundamentally alters" the data.  Overall, the court

17  finds that the addition of a bookmark falls short of the "fundamental alteration" of data

18  recognized by the Card Verification court.  To start, the court fails to see how a bookmark

19  can "fundamentally alter" a file when it is replaced with a new bookmark whenever the

20  user watches a part of the video.  Moreover, the only actual change to the data is an

21  update to a video's starting point to account for any viewing activity from a different

22  device, and such a change is more of a "manipulation" or "reorganization" than a

23  "fundamental alteration."  Thus, the court finds that the claimed process fails to

24  sufficiently "transform" the media file for purposes of the "machine or transformation" test.

25      Independent of the "machine or transformation" test, Rovi separately argues that

26  the "computer-implemented steps do not operate in a normal, expected manner," and

27  thus are "not broadly and generically claimed."  Rovi asserts that the claims require the

28  media-on-demand server to perform the following "special functions":

United States District Court
Northern District of California

> (1) delivering the media to first and second client devices through respective first and second communications links, (2) configuring the media in a format compatible with identified device properties of said first and second client devices, (3) recording a bookmark specifying a position in the media, and (4) delivering the media in a position specified by said recorded bookmark.

Dkt. 121 at 9 (citing '906 patent, claims 1, 6, 8).

The court fails to see how these functions – whether considered individually or as part of an ordered combination – are anything other than the "routine," "conventional" activity that was expressly rejected in Alice, Mayo, and Ultramercial.  The four steps enumerated by Rovi do nothing to limit the scope of the claims, and instead, cover all applications of bookmarking media files to allow playback on different devices.  Unlike DDR, where the court found that the "claims at issue do not attempt to preempt every application" of the abstract idea, and instead "recite a specific way to automate the creation of a composite web page," the claims here do indeed preempt every application of the abstract idea.  The steps recounted above – delivering the media to the devices in a compatible format, and recording a bookmark to allow playback to begin at that bookmark – are described at such a high degree of abstraction that it is impossible to conclude that they "recite a specific way" to record bookmarks for playback across different devices.  The claims do little more than describe the abstract idea of bookmarking across devices with an instruction to "apply it."

Rovi also cites to testimony from its expert, who opines that "the required first and second communications links are not a generic or conventional arrangement," but are instead "a particular arrangement that enables the media-on-demand server to perform the specialized function of delivering media to different types of devices depending on the media format the device is capable of receiving."  Dkt. 121 at 10 (citing Dkt. 121-1, ¶ 33).  However, the court finds these opinions to be wholly conclusory, as Dr. Shamos invokes the words "particular" and "specialized" without explaining how the claimed method differs from a conventional method for recording bookmarks for multiple-device playback.  While the very idea of allowing multiple-device playback may have been novel at the time of the

1   invention, the second step of the <u>Alice</u>/<u>Mayo</u> test requires more than a novel idea – it

2   requires a specific <u>application</u> of that idea, to ensure that all embodiments of the idea

3   (even if novel) are not preempted.

4         In sum, while Rovi repeatedly asserts that the '906 patent does "not wholly

5   preempt all practical applications of delivering media to different devices with different

6   capabilities," there court finds no basis to support that assertion.  As a result, the court

7   finds that the '906 patent fails to disclose an inventive concept under the second step of

8   <u>Alice</u>/<u>Mayo</u>'s test, and thus, is invalid under § 101.

9                               **CONCLUSION**

10        For the foregoing reasons, the court finds that the '929 patent, the '962 patent, the

11  '762 patent, the '709 patent, and the '906 patent are invalid under section 101.

12  Accordingly, Netflix's motion for summary judgment is GRANTED.

13        Because the court's judgment of invalidity "necessarily moots the issue of

14  infringement," Netflix's declaratory judgment claims for non-infringement and Rovi's

15  counter-claims for infringement are dismissed as moot.  <u>See</u> <u>TypeRight Keyboard Corp.</u>

16  <u>v. Microsoft Corp.</u>, 374 F.3d 1151, 1157 (Fed. Cir. 2004).

17

18        **IT IS SO ORDERED.**

19  Dated:  July 15, 2015

20                                    _____

21                                    PHYLLIS J. HAMILTON
                                      United States District Judge

22

23

24

25

26

27

28